1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

11

DAVID DINA LEON,

12            Plaintiff,

13      v.

14  NANCY BERRYHILL, Acting
    Commissioner of Social Security,

15

16            Defendant.

No.  1:16-cv-00023-SKO

**ORDER AFFIRMING COMMISSIONER'S
DENIAL OF SOCIAL SECURITY
DISABILITY BENEFITS**

17            Plaintiff, David Dina Leon, seeks judicial review of a final decision of the Commissioner

18  of Social Security ("Commissioner") denying her application for disability insurance benefits

19  pursuant to Title II and for supplemental security income ("SSI") pursuant to Title XVI of the

20  Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is before the Court on the

21  parties' cross-briefs, which were submitted without oral argument to the Magistrate Judge.[1]

22

23            Plaintiff presents two issues: (1) whether the Administrative Law Judge's ("ALJ")

24  residual functional capacity finding precluded Plaintiff's performance of alternative work activity,

25  and (2) whether the ALJ failed to articulate clear and convincing reasons for rejecting Plaintiff's

26  testimony.  Following a review of the administrative record and applicable law, the Court finds

27

28  [1] Pursuant to 28 U.S.C. § 636(c)(1), both parties consented in writing to the jurisdiction of a United States Magistrate
    Judge to conduct all further proceedings in the case, including the entry of final judgment.

1

the ALJ's decision to be supported by substantial evidence in the record as a whole and based on proper legal standards.

## I.  Procedural History

On May 9, 2012, Plaintiff filed separate applications for disability insurance benefits and SSI.  In both applications, Plaintiff alleged disability beginning July 4, 2009.  The Commissioner initially denied the claims on October 25, 2012, and upon reconsideration, on February 27, 2013.  On April 5, 2013, Plaintiff filed a timely request for a hearing.

Plaintiff appeared and testified at a hearing on April 1, 2014.  Cheryl R. Chandler, an impartial vocational expert, also appeared and testified.

On May 30, 2014, Administrative Law Judge Sharon L. Madsen denied Plaintiff's application.  The Administrative Council denied review on November 9, 2015.  On January 7, 2016, Plaintiff filed a complaint seeking this Court's review.

## II.  Factual Background

### A.  Plaintiff's Testimony and Written Reports

Plaintiff (born June 21, 1968) lived in a house with her 16-year-old son and 18-year-old daughter.[2]  She was five feet tall and weighed 175 pounds.  Plaintiff completed high school, participating in an unspecified special education program.  She attended, but did not finish, some college courses.

On a typical morning, Plaintiff awoke and got her son ready for school.  She threw in a load of wash and did some housekeeping before stopping to rest when her pain began.  Sometimes she crocheted.

Beginning in 2001, Plaintiff, who had previously packaged vitamins, began working as a cashier in grocery stores and fast food restaurants.  She stocked shelves, bagged groceries, and

---

[2] Plaintiff had four children, two of whom were adults at the time of the agency hearing.

carried out customer's purchases.

In 2006, Plaintiff's back was injured in an automobile accident.  Despite her pain, Plaintiff returned to work since it was necessary to support her family.  After two and one-half years, however, her pain was so great that Plaintiff could not continue working.

At the time of the hearing, Plaintiff experienced constant low back pain, which was aggravated in rainy or cold weather.  The pain radiated from her back to her left leg, which became numb and sometimes swelled.  Plaintiff elevated her leg to relieve the swelling.  She experienced pain when she moved her bowels.  She took pain medications (Ultram, Robaxin, and Neurontin), sat in hot baths, rested, and used a TENS unit and a home pelvic traction device.  Neither the TENS unit nor the traction device effectively relieved her pain.  Prescribed physical therapy increased her pain. Plaintiff, tried, but discontinued, medical marijuana.  Although a physician recommended surgery, Plaintiff lacked insurance or other means of paying for it.

Plaintiff wore a back brace.  Her physicians had given varying directions for its use.  Plaintiff wore it four hours daily and found that it did not relieve her pain.  When she removed the brace, however, her pain worsened.

Most mornings, Plaintiff had a headache.  The most effective remedy was to induce vomiting and sleep.  Plaintiff also experienced vertigo and had high blood pressure.

Plaintiff estimated that she could lift no more than five pounds.  At most, she could sit for one-half hour before she needed to stand up.  She could then stand for one-half hour before needing to sit down.  Plaintiff, who used a cane or a walking stick, was able to walk as far as "next door."  Climbing stairs was "very hard."  When she bent over, she was sometimes unable to straighten up.

Plaintiff retained her driver's license and drove a car, although she was "not supposed to."  She did household chores, went shopping, and attended church when she was able to do so.  She

sometimes needed help when showering, and her children put on her socks and shoes.

The changes in Plaintiff's life caused depression.  She could not do the things that she did before her back injury.  Plaintiff cried constantly.  She could not control things that she "should not be thinking," and was unable to pay attention to television programs or crocheting, but could manage bill paying and budgeting.

Plaintiff took Celexa for depression.  She had stopped seeing the social worker although she was supposed to have made arrangements to continue therapy.

**B.    Medical Records**

The record includes the examination notes of Syed Naqvi, M.D., and various physician assistants and nurse practitioners at Family Healthcare Network from 2008 through 2014.  Plaintiff was treated for migraine and tension headaches on multiple occasions, and complained of anxiety and depression.[3]

In November 2008, Plaintiff rated her back pain as nine out of ten and reported muscle spasms in her back.  Beginning in July 2009, she was off work for back pain.  A July 18, 2009, MRI at Advanced Radiology of Beverly Hills revealed 1-2 mm disc bulges at L2-3 and L3-4; moderate left and right neural foraminal narrowing secondary to a 2 mm disc bulge and facet joint hypertrophy at L4-5; and a posterior annular tear and 2-3 mm disc bulge resulting in moderate-to-severe left and mild right neural foraminal narrowing and facet joint hypertrophy at L5-S1.

Thereafter, the examination notes consistently reflect Plaintiff's reported low back pain and use of various prescription pain relievers including Cycobenzaprine, Naproxen, Gabapentin, and Hydrocodone.  On October 9, 2009, Michael Flores, PA-C, noted shoulder pain upon movement and intermittent back pain.  On April 12, 2010, Flores provided an excuse from work until June 15, 2010.  On August 4, 2010, Flores prepared paperwork for Plaintiff's disability

_____

[3] Plaintiff was also treated for various ailments, including acute upper respiratory infections and routine gynecological care, that will not be addressed in this opinion because they are not relevant to the pending issues.

application.  Plaintiff's lower back was tender to palpation, but her thoraco-lumbar spine was normal in all regards.  A positive straight leg test revealed lower extremity weakness.  Plaintiff rated her pain at six.  Flores authorized permanent disability parking, and in January 2012, he diagnosed Plaintiff with chronic pain syndrome.

On September 23, 2009, neurologist Boota S. Chahil, M.D., administered a sensory nerve conduction study.  Dr. Chahil found "no evidence of compression neuropathy, polyneuropathy, or ongoing lumbar radiculopathy."

Dr. M. Rashidi of Bakersfield Neuroscience and Spine Institute treated Plaintiff between November 2009 and June 2010.  In a November 2009 report to Dr. Syed, Dr. Rashidi diagnosed Plaintiff with low back pain with radiation to the legs and disc degenerative changes and foraminal stenosis at L4-L5 and L5-S1.  Based on a neurological examination, Plaintiff's mental status and cranial nerves were normal, sensation was intact, and deep tendon reflexes were symmetrical.  Plaintiff had normal power in her upper and lower extremities on both sides.  Dr. Rashidi recommended lumbar epidural injections, use of a lumbar brace, and clinical follow-up.

On August 25, 2010, radiologist Thomas W. Maclennan, M.D., reviewed Plaintiff's lumbar spine x-rays and observed a moderately reduced range of motion between flexion and extension.  Alignment of vertebral bodies was satisfactory.  There was no fracture or spondylolisthesis.  Although a February 20, 2010 MRI study was generally consistent with the X-rays, Dr. Maclennan observed diffuse disc desiccation, disc space narrowing at l4-L5, a 2 mm central disc bulge extending to the foraminal regions at L5-S1, a mild left L5 ganglionic compression, and a 1 mm disc bulge at L4-L5.  There was no disc protrusion at L3-L4, L2-L3, or L1-L2.

On February 1, 2011, Jaime Aguet, M.D., reviewed an MRI performed at Kaweah Delta Medical Center.  Dr. Aguet diagnosed mild lumbar spondylosis and mild facet arthropathy at the

L4-5 and L5-S1 levels.  No disc herniations nor significant central or peripheral spinal cord stenosis correlated with Plaintiff's history of back pain.  The conus medullaris and cauda equine were normal.

On March 11, 2011, neurologist Timothy M. Wiebe, M.D., F.A.A.N.S., of Bakersfield Neuroscience and Spine Institute noted that Plaintiff reported constant pain and bladder and bowel difficulties, including episodes of both incontinence and inability to void.  Plaintiff also reported frequent headaches, some of which awakened her from sleep at night.  A February 2, 2011, MRI revealed "termination of the conus medullaris at the level of the inferior L2 vertebrae, a thickened fatty filum signal on an axial t1 image at the L1-2 level, and degenerative stenosis/trefoil canal at L3, L4, and L5."  Dr. Wiebe diagnosed (1) multilevel lumbar stenosis with claudication, (2) tethered cord syndrome with low lying conus medullaris and fatty filum terminale, and (3) headaches with features of Ciari malformation.  In view of Plaintiff's incontinence, Dr. Wiebe recommended urgent surgery: bilateral laminectomies at L3 through L5, medial facetectomies, and detethering.

In September 2012, internist Roger Wagner, M.D., performed a consultative examination for the agency.  Plaintiff told Wagner that she exercised using a recumbent bike and a treadmill and also walked for exercise.  Wagner observed that Petitioner was easily able to get out of the waiting room chair, get on and off the examining table, take off her shoes, and retrieve them from the ground.  She walked at normal speed.  Plaintiff bent forward at the lumbar spine when walking or sitting.

Dr. Wagner diagnosed Plaintiff with generalized low back pain and mild facet arthropathy.  EMG and nerve conduction studies showed no radiculopathy, leaving Plaintiff's leg pain without a known cause.  Dr. Wagner opined that Plaintiff could stand and sit up to six hours sit with no limitations with normal breaks, lift and carry 50 pounds occasionally and 25 pounds

frequently, and stoop and crouch no more than frequently.  No assistive device was necessary, and manipulative activities and workplace environmental activities were unlimited.

When Plaintiff saw Elijah Youssefi, PA-C, at Family Health Network on October 30, 2012, she complained of back pain dating to her motor vehicle accident and was taking no prescription pain reliever or medication of any type.  Plaintiff told Youssefi that, in the past, she had taken Oxycontin for pain and had a license for medical marijuana.  She added that she was looking for disability for her back pain.  Youssefi prescribed naproxen, Toradol, and Ultram (tramadol).

In early 2013, Megan Hensley, PA-C, of Family Health Network reported that Plaintiff was experiencing anxiety.  She prescribed Celexa, which counteracted Plaintiff's anxiety and reduced Plaintiff's high blood pressure.  In April 2013, Hensley referred Plaintiff for physical therapy.[4]

Dr. Maclennan reviewed an April 8, 2013, MTI study which revealed (1) lumbar levoscoliosis of 8 degrees, (2) no lumbar fracture, (3) desiccated discs at the four lower lumbar levels, (4) adequate marrow signal, (5) 3 mm left disc bulge at L5-S1 contiguous with left S1 nerve root, (6) 2 mm central lumbar disc bulge at L4-L5, and (7) no disc protrusion at L3-L4, L2-L3, and L1-L2.

On April 29, 2013, Hensley noted that Plaintiff had "failed physical therapy."  Naproxen was not relieving Plaintiff's back pain.  On June 4, 2013, Hensley noted that Robaxin and Amitriptyline were relieving Plaintiff's back pain and helping her sleep but that her blood pressure was elevated.  On June 18, 2013, Plaintiff was feeling better but was again anxious as a result of significant stress at home.

//

---

[4] The reference includes a copy of a single treatment note for an initial physical therapy assessment at Sierra View Hospital.  Due to the poor quality of the copy, the note is illegible.

On June 24, 2013, Plaintiff was treated by an unidentified practitioner at Bakersfield Neuroscience and Spine Institute.  Plaintiff complained of lower back pain radiating to her leg and reported that she had fallen several times due to weakness in that leg.  After performing an EMG study on July 13, 2013, Dr. Salehi opined that the sensory and motor studies were essentially normal.

A MRI study at Advanced Radiology of Beverly Hills on August 31, 2013, revealed spondolytic changes in the lumbar spine as well as disc bulges and facet hypertrophy at L2-L3, L3-L4, L4-L5, and L5-S1.  On September 26, 2013, Majid Rahimifar, M.D., at Bakersfield Neurology and Spine Institute found that objective findings were disproportional to the imaging findings.  He prescribed Ultram, a TENS unit, soft tissue massage hydrotherapy, a soft lumbar corset, and home pelvic traction, and advised Plaintiff to avoid taking narcotics.  Dr. Rahmifar opined that combining Ultram and Nortriptyline could lead to complications.  A January 6, 2014, note indicated that conservative treatment had failed and recommended lumbar decompression and other (illegible) surgery as well as evaluation for spinal fusion.[5]

At an examination at Family Health Network on April 23, 2014, Plaintiff again complained of back pain and advised Chad Spilker, PA-C, that Neurontin provided better pain relief than Tramadol.  On May 12, 2014, Plaintiff complained of generalized joint pain, particularly in her upper extremities, and "3 pinched nerves in her back."

**C.**     **Vocational Expert Testimony**

Ms. Chandler testified as the vocational expert.  After reviewing Plaintiff's work history, Ms. Chandler opined that Plaintiff's prior job combined the cashier-checker (DOT 211.462-014) (semi-skilled, SVP 3, light) job with the job of bagger (DOT 920.687-014) (unskilled, SVP 2, medium).  Plaintiff's work in fast food restaurants (DOT 311.472-010) was unskilled, SVP 2, and

---

[5] Lacking insurance coverage, Plaintiff was unable to have the recommended surgery,

light.  Plaintiff's prior work packaging vitamins was not substantial gainful experience.

For the first hypothetical question, the ALJ directed Ms. Chandler to assume a hypothetical person with the same age, education and work background as Plaintiff, who could lift and carry 50 pounds occasionally and 25 pounds frequently, and could sit, stand, or walk from six to eight hours with frequent stooping, crouching, crawling, climbing, and kneeling.  Ms. Chandler opined that the hypothetical individual could perform Plaintiff's past work.

For the second hypothetical question, the ALJ directed Ms. Chandler to consider a "light work scenario," that is, a person who could lift and carry 20 pounds occasionally and two pounds frequently, and could sit, stand or walk for six to eight hours with occasional stooping, crouching, crawling, climbing, and kneeling.  Ms. Chandler opined that the hypothetical individual could perform Plaintiff's past work as a fast food worker.

For the third hypothetical question, the ALJ directed Ms. Chandler to consider the same individual as the one described in the second question with the addition of a sit/stand option.  Ms. Chandler opined that the hypothetical person could not perform Plaintiff's past work.  Available light, unskilled SVP 2 jobs included (1) cashier (DOT 211.462-010) with a 90 percent erosion of such jobs generally available in the labor market, for a total of 12,000 jobs; (2) counter clerk (DOT 249.366-010), with a 90 percent erosion of available jobs, for a total of 1500 jobs; and (3) information clerk (DOT 237.367-018), for which the 90 percent erosion of generally available jobs resulted in 1000 available jobs with a sit/stand option.

For the fourth hypothetical question, the ALJ directed Ms. Chandler to consider the individual described in the third hypothetical question with the need for an additional two to four 30-minute breaks daily.  Ms. Chandler opined that no work would be available for such a person.

Plaintiff's attorney then presented additional hypothetical questions.  For the fifth hypothetical question, he directed Ms. Chandler to consider an individual able to lift no more than

five pounds; sit for 30 minutes at a time; stand for no more than 30 minutes at a time; and unable to bend, climb stairs, or remain focused for more than two hours at a time.  Characterizing the hypothetical person as possessing less than sedentary ability, Ms. Chandler opined that no work would be available for such a person.

In the sixth hypothetical question, Plaintiff's attorney directed Ms. Chandler to consider an individual capable of medium work who would need to elevate her leg for one to two hours. Ms. Chandler opined that no work would be available for the hypothetical person if she required a sit/stand option since elevation was generally only available with a sit-down job.

### III.    Legal Standard

#### A.    Applicable Law

An individual is considered disabled for the purpose of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner shall consider the combined effect of all of the individual's impairments without regard to whether such impairment, if considered separately, would be of such severity."  42 U.S.C. § 423(d)(2)(B).  For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act."  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The Ninth Circuit provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant if a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, App. 1.  If so the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the residual functional capacity ("RFC") to perform any other gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  *See also* 20 C.F.R. § 404.1520(a)(4) and 416.920(a)(4) (providing a "five-step evaluation process").  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps," *Tackett*, 180 F.3d at 1098.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis."  *Burch*, 400 F.3d at 679.  "However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show the claimant can perform other substantial gainful work."  *Id.*

**B.**     **Scope of Review**

"This court may set aside the Commissioner's denial of disability insurance benefits where the ALJ's findings are based on legal error or are not supported by substantial evidence in

11

the record as a whole." *Tackett*, 180 F.3d at 1097.  "Substantial evidence is defined as being

more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152,

1156 (9th Cir. 2001).  "Put another way, substantial evidence is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Id.*

"This is a highly deferential standard of review." *Valentine v. Comm'r of Soc. Sec.*

*Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ's findings will be upheld if supported by

inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9[th]

Cir. 2008).  "If the evidence is susceptible to more than one rational interpretation, the court may

not substitute its judgment for that of the Commissioner." *Edlund*, 253 F.3d at 1156.

Nor may the court affirm "simply by isolating a specific quantum of supporting

evidence." *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.

1998)).  "Rather, a court must 'consider the record as a whole, weighing both evidence that

supports and evidence that detracts from the [Commissioner's] conclusion." *Tackett*, 180 F.3d at

1098 (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, a court may not reverse an ALJ's decision if the error is harmless.  *Molina v.*

*Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2006).  Harmless error "exists when it is clear from the

record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'"

*Tommasetti*, 533 F.3d at 1038 (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-

56 (9th Cir. 2006)).  The party attacking an agency determination bears the burden of proving that

the error was harmful.  *Shinseki v. Sanders*, 566 U.S. 396, 409 (2009).

## IV.   Discussion

### A.      Determination of Residual Functional Capacity

Plaintiff contends that the ALJ erred in determining that Plaintiff's residual functional

capacity allowed her to perform the alternative occupations of cashier (DOT 211.462-010)

counter clerk (DOT 249.366-010), and information clerk (DOT 237.367-018).  Because the

Dictionary of Occupational Titles (DOT) descriptions of these jobs do not address the sit/stand

option that Plaintiff required, Plaintiff maintains that the ALJ should have required the vocational

expert to address the inconsistency between her testimony that Plaintiff could perform these jobs

12

and the DOT job requirements.  The Commissioner counters that the ALJ properly determined that the vocational expert's testimony was consistent with the DOT.

### 1.     The Administrative Record

Following a review of the detailed resume setting forth her extensive relevant education and experience, and her testimony confirming the accuracy of her resume, the ALJ admitted Ms. Chandler's testimony as the vocational expert.  After Chandler testified in response to the various hypothetical questions posited by the ALJ and Plaintiff's attorney, the ALJ asked, "Ms. Chandler, is your testimony consistent with the DOT?"  AR 54.  Ms. Chandler replied, "Yes, your honor."  AR 54.

In a written determination, the ALJ found that Plaintiff had the residual functional capacity to perform light work -- that is, "to lift and carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and/or walk 6 to 8 hours in an 8-hour work day, and occasionally stoop, crouch, crawl, climb, and kneel, except that she required the option to sit or stand."  AR 16.  Ms. Chandler testified that jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity, naming three exemplary jobs: cashier (DOT 211.462-010) counter clerk (DOT 249.366-010), and information clerk (DOT 237.367-018).  Ms. Chandler adjusted the number of available positions for each position to include only the ten percent of those jobs that would permit Plaintiff to sit or stand at will. AR 21.  The ALJ opined that this testimony was consistent with the information in the DOT.  AR 21.

### 2.     No Inconsistency Between DOT and Expert Testimony

"[B]efore relying on VE [vocational expert] or VS [vocational specialist] evidence to support a disability determination or decision, [the ALJ] must . . . identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the *Dictionary of Occupational Titles* (DOT), including its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (SCO), published by the Department of Labor, and . . . [e]xplain in the determination or decision how any conflict that has been identified was resolved."  SSR 00-4p.  Following the issuance of SSR oo-4p, the Ninth Circuit held that an ALJ may not rely on a vocational expert's

13

testimony concerning a claimant's ability to perform a specific job without first inquiring whether the testimony conflicts with the DOT. *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). In *Massachi*, the court required the ALJ to determine (1) whether a conflict between the VE's testimony and the DOT exists and (2) "whether the vocational expert's explanation for the conflict is reasonable and [(3)] whether a basis exists for relying on the expert rather than the *Dictionary of Occupational Titles*." 486 F.3d at 1153. In this case, the ALJ asked the vocational expert whether her testimony was consistent with the DOT, and the VE confirmed that her testimony was consistent. *Massachi* appears to require nothing more.

Nonetheless, Plaintiff contends that because the DOT is silent on the sit/stand option, the vocational expert's opinion must be deemed inconsistent with the DOT. Plaintiff acknowledges that expert testimony is needed to identify specific jobs Plaintiff can perform despite her non-exertion limitation (sit/stand option). *See* Doc. 19 at 3 n. 1, citing *Polny v. Bowen*, 864 F.2d 661, 663-64 (9th Cir. 1988); *Jones v. Heckler*, 760 F.2d 993, 998 (9th Cir. 1985). Because *Polny* and *Jones* address whether the ALJ could resolve each claimant's disability status using the grids or whether vocational expert testimony was necessary to determine disability, however, these cases offer little assistance in resolving Plaintiff's claim that the vocational expert impermissibly offer an opinion that was inconsistent with the DOT.

As a matter of agency policy, no specific rule applies when a claimant's residual functional capacity does not coincide with the defined exertional ranges of work. SSR 83-12. In such cases, the occupational base is affected and the number of available jobs may be eroded, sometimes minimally and sometimes substantially. *Id.* "When the extent of erosion of the occupational base is not clear, the adjudicator will need to consult a vocational resource." *Id.*

A claimant's need to alternate standing and sitting is an area in which the opinion of a VE or VS is essential:

> In some disability claims, the medical facts lead to an assessment of RFC which [is] compatible with the performance of either sedentary or light work except that the person must alternate periods of standing or sitting. The individual may be able to sit for [a] time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition

14

of sedentary work (and for the relatively few light jobs which are performed primarily in the seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting or standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

There are some jobs in the national economy—typically professional and managerial ones—in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS should be consulted to clarify the implications for the occupational base.

SSR 83-12.

Ms. Chandler acknowledged the necessity of adjusting the occupational base because of Plaintiff's requirement of a sit/stand option, "A VE's recognized expertise provides the necessary foundation for his or her testimony." *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005). "[An] ALJ's failure to elicit foundational testimony from the VE explaining the specific research and experience which led to the VE's conclusions regarding the sit/stand option [does] not constitute error." *McClanahan v. Colvin*, 2015 WL 6535475 at *5 (E.D. Cal. Oct. 28, 2015) (No. 1:14-cv-00925-SKO) (citing *Devore v. Comm'r of Soc. Sec.*, 2015 WL 3756328 at *4 (E.D. Cal. June 16, 2015) (No. 1:14-cv-00663-SAB)). If there is no apparent conflict and if the vocational expert testified based on her professional experience, there is no error under *Massachi*. *Ellis v. Colvin*, 2016 WL 212675 (D. Ariz. Jan. 19, 2016) (No. CIV 14-2417-PHX-MHB).

Further, the availability of specific positions suitable for the claimant within the broader range of the applicable exertional level is not a matter addressed in the DOT, which defines the typical duties of each position and sets forth in detail the physical requirements for performing the work. *Massachi*, 486 F.3d at 1153 n. 8; *Ruiloba v. Colvin*, 2016 WL 3067 at *4 (C.D. Cal. May 31, 2016) (No. EDCV 15-1280 JC); *Devore,* 2015 WL 3756328 at *3-4. Here, the vocational expert opined that Plaintiff was capable of performing the three exemplary jobs so long as the particular job placement permitted Plaintiff to sit or stand at will. Ms. Chandler testified that not

1  all available jobs in those positions would accommodate Plaintiff's sit/stand requirement and

2  reduced the number of available jobs to exclude those that would be unsuitable for Plaintiff.  Such

3  an adjustment is within a vocational expert's expertise.  *See Terry v. Sullivan*, 903 F.2d 1273,

4  1279 (9th Cir. 1990) (ALJ may infer support for deviation where vocational expert's

5  understanding of applicable legal standards is clear from context).

6  　　　　The DOT does not set forth how many of each defined job is available nationally and

7  regionally.  After identifying appropriate job categories, the vocational expert must testify about

8  the number of jobs available and an erosion of that number due to a claimant's particular non-

9  exertional limitations.  Since the expert opinion of the number of available jobs is not drawn from

10  the DOT, consistency with the DOT definitions is not generally a factor in vocational expert

11  testimony concerning job availability.  As a result, an expert's opinion on the reduction of

12  availability numbers to accommodate non-exertional requirements does not give rise to an

13  inconsistency between the expert's testimony and the DOT.  *Compare this case to Zavalin v.*

14  *Colvin*, 778 F.3d 842, 845 (9th Cir. 2015) (inconsistency arising from the claimant's ability to

15  perform simple repetitive tasks and the DOT's characterizing the exemplary job as requiring

16  Level 3 reasoning); *Tommasetti*, 533 F.3d at 1042 (inconsistency between ALJ's finding that

17  claimant could perform his previous work as an electronics assembler, a job requiring light

18  exertion, and claimant's impairment's limiting him to sedentary work); *Pinto v. Massanari*, 249

19  F.3d 840, 846 (9th Cir. 2001) (inconsistency arising from ALJ's finding that claimant could

20  perform work as a hand packager, a medium job requiring more than occasional stooping and

21  bending, and the ALJ's finding that the claimant was unable to stoop, climb, and balance).

22  　　　　Neither the DOT nor vocational expert testimony trumps the other when there is a

23  conflict.  *Massachi*, 486 F.3d at 1153 (quoting SSR 00-4p at *2).  In *Massachi*, the Ninth Circuit

24  held that an ALJ may not "rely on a vocational expert's testimony regarding the requirements of a

25  particular job without first inquiring whether the testimony conflicts with the DOT."  *Id.*  The

26  ALJ made the required inquiry in this case, and the vocational expert denied any conflict.

27  Because the ALJ complied with the *Massachi* requirement, the ALJ did not err in accepting the

28  vocational expert's opinion on the number of available positions that would accommodate

16

1   Plaintiff's non-exertional limitation.

2   **3.      Any Error Was Harmless and Without Prejudice**

3   Even if the ALJ erred in relying on the vocational expert's statement that her testimony

4   was consistent with the DOT, Plaintiff has not established that the error resulted in any prejudice.

5   Plaintiff bears the burden of proving that the alleged error was prejudicial.  *Massachi*, 486 F.3d at

6   1153-54 n. 19.  *See also Cordray v. Astrue*, 2010 WL 2608331 at *9 (D.Or. March 3, 2010) (Civil

7   No. 08-1386-JE) (citing *Shinseki*, 556 U.S. at 409).

8   "Remand for further administrative proceedings is appropriate if enhancement of the

9   record would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).  Plaintiff does

10  not claim that remanding this case to allow the vocational expert to document her opinion in more

11  detail would change the ultimate result.  Errors such as the one asserted in this issue are subject to

12  a finding of harmless error when the vocational expert's testimony provided sufficient support for

13  her opinion to justify any potential conflict.  *Massachi*, 486 F.3d at 1154 n. 19; *Coleman v.*

14  *Astrue*, 423 Fed.Appx. 754, 756 (9th Cir. 2011).  To the extent that the ALJ erred in accepting Ms.

15  Chandler's testimony that her opinion was consistent with the DOT, the error is harmless.

16  **B.      Credibility of Plaintiff's Testimony**

17  Plaintiff next contends that the ALJ erred in failing to support her opinion that Plaintiff's

18  testimony lacked credibility with specific, clear, and convincing reasons for that conclusion.

19  **1.      The Agency Decision**

20  The ALJ's analysis first focused on determining whether Plaintiff had an underlying

21  medically determinable physical or mental impairment that could reasonably be expected to

22  produce Plaintiff's pain and other symptoms.  In doing so, the ALJ took into account the role of

23  Plaintiff's obesity in aggravating the symptoms of her back condition.  In recounting the medical

24  records, the ALJ noted the varying severity and nature of Plaintiff's complaints since the initial

25  onset date.  In particular, complaints of radiating numbness, muscle spasms, incontinence, and

26  response to medications varied over time.  Agency physicians and the internal medicine

27  consultative examiner opined that Plaintiff was capable of performing medium work.

28  //

Based on her review of the record, the ALJ gave limited weight to the opinions of the state agency evaluators and the internal medicine consultative examiner "because the medical evidence of the record as a whole supports greater and/or additional physical limitations, and the claimant's subjective complaints and the combined effects of her impairments were not adequately considered."  AR 19.  In particular, the ALJ noted that because the results of the most recent MRI showed multi-level disc bulges, facet arthropathy, and foraminal narrowing, a more restrictive residual functional capacity than medium work was appropriate.

The ALJ did not fully accept Plaintiff's testimony concerning her own limitations, however:

> After careful consideration of the evidence, I find that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.
>
> The claimant testified she has a driver's license, but she is not supposed to drive (however, I do not see any preclusions from driving in the medical evidence of record).  The claimant stated she needs help with showering at times (contrary to the statements to the internal medicine consultative examiner that she can perform he activities of daily living with out assistance, above).  The claimant admitted she can do household chores, laundry, cook using a microwave, shop, attend church, and get her son ready for school.  She said she also likes to crochet.  The claimant testified that due to her back pain and left leg numbness, she has difficulty bending, lifting heavy items, standing, and sitting.  She denied that pain medications helped her pain (contrary to statements in the medical records, above).  The claimant testified that she can lift 5 pounds at most, sit and stand ½ hour at most, and walk "about a house down."  She said she wears a back brace, and she must elevate her legs due to swelling (however, while I note that a soft back brace was prescribed, the medical examinations have not indicated any swelling on physical examinations, above, and no medical source has recommended that the claimant elevate her legs).
>
> I give limited weight to the claimant's subjective complaints and alleged physical limitations because they are not entirely supported by the medical evidence of record and opinion evidence.  For example, while the MRI of the claimant's back showed multiple positive findings, as noted above, physical examinations have yielded few objective findings in the claimant's back and lower extremities, essentially limited to tenderness of the lower back, decreased range of motion, and positive leg raise tests, without edema, swelling, instability, or weakness.

18

> In addition, the claimant has reported improvement with medications to her medical providers, as indicated above, contrary to her testimony and she has had only conservative treatment for her pain. Lastly, while claimant testified that her activities of daily living are limited due to pain, she reported a wide range of activities of daily living to the internal medicine consultative examiner, above, including cooking, cleaning, shopping, and various forms of exercise (i.e., recumbent bike, treadmill, and walking). For these reasons, the claimant's allegations of disability are not entirely credible.

AR 19–AR 20.

### 2.    The ALJ Properly Evaluated Plaintiff's Credibility

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007) (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Sec'y of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996) (quoting *Varney v. Sec'y of Health and Human Serv.*, 846 F.2d 581, 584 (9th Cir. 1988)). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity, and effect of the claimed symptoms. *Light v. Soc. Sec. Admin,*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the

1    symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or

2    inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and

3    (3) the claimant's daily activities." *Tommasetti*, 533 F.3d at 1039 (quoting *Smolen v. Chater*, 80

4    F.3d 1273 (9th Cir. 1996)).  If the ALJ's finding is supported by substantial evidence, the Court

5    may not second-guess his or her decision.  *Thomas*, 273 F.3d at 959.

6         An ALJ may reasonably consider the nature of a claimant's treatment, as the ALJ did in

7    this case.  Inconsistency between a plaintiff's pain testimony and objective medical evidence is a

8    relevant consideration in assessing credibility.  *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir.

9    2004).  Evidence of conservative treatment, such as that provided to Plaintiff, is sufficient to

10   discount testimony concerning the severity of the complaint.  *See Parra v. Astrue*, 481 F.3d 742,

11   750-51 (9th Cir. 2007).  In *Tommasetti*, for example, the claimant's positive response to

12   conservative treatment including physical therapy, anti-inflammatory medication, a

13   transcutaneous electrical stimulation ("TENS") unit, and lumbosacral corset undermined the

14   claims of a severely disabling condition.  533 F.3d at 1039.  *See also Meanel v. Apfel*, 172 F.3d

15   1111, 1114 (9th Cir. 1999) (rejecting subjective pain testimony as inconsistent with the minimal,

16   conservative treatment received).

17        An ALJ may also rely on a claimant's reported activities in forming his or her conclusion.

18   For example, an ALJ properly considered a claimant's plans to go deer hunting in determining

19   that the claims were not fully credible.  *Shuey v. Astrue*, 480 Fed.Appx. 439, 440-41 (9th Cir.

20   2012).  *See also Bray v. Comm'r, Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (finding

21   limited credibility where claimant continued to smoke despite claims of debilitating shortness of

22   breath, led an active lifestyle, continued to seek work, told her physician the she only became

23   wheezy upon heavy exertion, and provided testimony inconsistent with the medical records).

24        In this case, the ALJ carefully evaluated Plaintiff's credibility and documented her

25   reasoning in the agency decision.  The Court will not disturb the ALJ's conclusion that Plaintiff's

26   testimony was not fully credible.

27   //

28   //

**V.      Conclusion and Order**

The Court finds that the ALJ applied appropriate legal standards and that substantial evidence supported the ALJ's determination that Plaintiff was not disabled.  Accordingly, the Court AFFIRMS the Commissioner's denial of Social Security disability insurance benefits and supplemental security income and DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **March 30, 2017**                              /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE

21